FILED

07/06/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0362

DA 20-0362

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 161

MASTERS GROUP INTERNATIONAL, INC.,

   Third-Party Plaintiff, Appellee,
   and Cross-Appellant,

   v.

COMERICA BANK,

   Third-Party Defendant, Appellant,
   and Cross-Appellee.

APPEAL FROM:     District Court of the Second Judicial District,
                 In and For the County of Butte-Silver Bow, Cause No. DV-2011-372
                 Honorable Ray J. Dayton, Presiding Judge

COUNSEL OF RECORD:

         For Appellant and Cross-Appellee:

             James H. Goetz, Goetz, Baldwin & Geddes, P.C., Bozeman, Montana

             David M. Wagner, Jeffrey R. Kuchel, Crowley Fleck PLLP, Missoula,
             Montana

             Joseph J. Shannon, Jane Derse Quasarano, Bodman PLC, Detroit, Michigan

         For Appellee and Cross-Appellant:

             L. Randall Bishop, Attorney at Law, Kalispell, Montana

             Timothy B. Strauch, Strauch Law Firm, PLLC, Missoula, Montana

             Ward E. "Mick" Taleff, Taleff & Murphy, P.C., Great Falls, Montana

         For Amicus Curiae Montana Bankers Association and Montana Independent
         Bankers Association:

             Randy J. Cox, Boone Karlberg P.C., Missoula, Montana

Submitted on Briefs:  March 17, 2021

Decided:  July 6, 2021

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Masters Group International, Inc. (Masters), and Comerica Bank (Comerica) cross-appeal from the November 8, 2019 Decision, Findings of Fact & Conclusions of Law, the June 12, 2020 Decision & Order on Costs, Interest & Attorney Fees, and the accompanying June 17, 2020 Judgment issued by the Second Judicial District Court, Butte-Silver Bow County, following a January 9-19, 2017 bench trial.

¶2 We restate the issues on appeal as follows:

1. *Is the District Court's determination under Michigan law that Comerica breached the parties' Forbearance Agreement causing Masters to suffer contract damages supported by substantial evidence?*

2. *Absent any effort by Comerica to plead or prove a claim or defense for setoff or recoupment, is the District Court's rejection of such a post-trial argument legally correct?*

3. *Is the District Court's determination under Michigan law that Masters is entitled to prejudgment interest legally correct and does the amount exceed the bounds of reason?*

4. *Is the District Court's determination under Montana law that Masters is entitled to attorney fees legally correct?*

5. *Was Masters entitled under Michigan law to recover damages for lost profits or the lost value of the United Kingdom business?*

6. *Is Masters entitled to recover all costs, not just statutory costs?*

¶3 We affirm in part, reverse in part, and remand this matter to the District Court.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 This is the second appeal between these two parties regarding a $10.5 million loan from Comerica to Masters and Masters' eventual default on that loan. In 2015, this Court issued its opinion in *Masters Group Int'l, Inc. v. Comerica Bank*, 2015 MT 192,

3

380 Mont. 1, 352 P.3d 1101 (*Masters I*), which, in relevant part, reversed a jury verdict in favor of Masters and against Comerica in the amount of $52,037,593 and remanded the matter to the District Court to hold a new trial applying Michigan law. *Masters I*, ¶ 108. The *Masters I* opinion summarized the history of the case through the first trial and that background need not be repeated in full here. *See Masters I*, ¶¶ 3-31.

¶5 Masters was created by a group of investors who sought to acquire an existing office products business based in the United Kingdom and expand its operations into North America. On July 11, 2006, Masters obtained a $9 million loan from Comerica to accomplish this purpose. Both Masters and Comerica were represented by counsel in negotiating the loan. The language of the loan provided it would "be governed by and construed and enforced in accordance with the laws of the State of Michigan." One of Masters' investors, Larry Pratt (Pratt) and the Larry F. Pratt Living Trust, guaranteed Masters' loan by pledging $9 million worth of marketable securities. The loan was due to be repaid on or before July 11, 2008. With the money from the loan, Masters was able to acquire the U.K. company.

¶6 Masters sought to establish a new world headquarters in Butte and entered into a $200,000 loan agreement with the Butte Local Development Corporation (BLDC) in December 2006, to help finance start-up expenses for moving to Butte. In 2007, Masters leased warehouse space in Reno, Nevada, after it determined the proposed Butte facility was not feasible. Masters also amended its loan agreement with Comerica twice in 2007 for two $500,000 principal increases in the loan, bringing the total to $10 million. Masters provided Comerica with a $500,000 letter of credit from investors Matthew and Lilian

4

Nolan (collectively Nolan) and a personal pledge of $500,000 from the Wachovia Bank control account of investor Dr. Michael Vlahos (Vlahos). Both 2007 amendments again provided the loan was to be governed by Michigan law and neither changed the July 11, 2008 maturity date.

¶7 In early 2008, the stock market began to crash, and the value of Pratt's pledged marketable securities decreased. Comerica sent Masters a Notice of Default on April 28, 2008, which explained Masters was in default because it was no longer in compliance with the borrowing formula after the decrease in value of Pratt's securities. Masters did not repay the $10 million loan by the maturity date of July 11, 2008. Comerica sent Masters another Notice of Default on July 30, 2008. On August 1, 2008, Comerica sent Masters a letter noting it was declining to extend the loan's maturity date and would forbear only from "day to day." Masters began to seek out a new lender. On August 27, 2008, Comerica loaned Masters another $500,000 and extended the now-$10.5 million loan's maturity date to November 1, 2008, based on a $500,000 letter of credit from investor Gerry Taylor (Taylor). Once again, the amendments to the loan stipulated that the agreements would be governed by Michigan law.

¶8 Masters did not repay the loan by November 1, 2008. On November 25, 2008, Comerica sent Masters another notice it was still out of compliance with the borrowing formula, noted it was again forbearing from "day to day," and demanded payment in full by December 5, 2008. Masters, which had been continuing to seek alternative financing since the August letter from Comerica, received an initial term sheet from Wells Fargo on December 2, 2008, and a modified term sheet on December 17, 2008, both of which were

5

disclosed to Comerica. The term sheets, which were not binding, contemplated a $13 million loan from Wells Fargo to Masters, which would allow Masters to both pay off the $10.5 million Comerica loan and also finance its day-to-day operations of the business.

¶9 On December 17, 2008, Comerica sent Masters an offer to forbear on the loan until February 16, 2009 (the Forbearance Agreement). The Forbearance Agreement, like the loan, contained a provision that the agreement was to be governed by Michigan law. The Forbearance Agreement was signed by Karl Norton (Norton), a Vice President of Comerica's Special Assets Group. As we explained in *Masters I*:

> The Forbearance Agreement stated that Masters was in default for failing to repay the loan from Comerica and for being out of compliance with the borrowing formula. It provided that Masters acknowledged that Comerica was "under no obligation to advance funds or extend credit to [Masters]," and that Comerica did not "intend to make further advances." It further provided: "Subject to timely, written acceptance by Borrower and Guarantors of the following conditions, Bank is willing to forbear until February 16, 2009, subject to earlier termination as provided below, from further action to collect the Liabilities."

> The agreement imposed numerous significant conditions. Masters agreed to deposit $56,204 into Comerica's account, an amount equivalent to the estimated aggregate interest payments due from January 1, 2009, to February 16, 2009. On or before December 29, 2008, Vlahos (or another investor) would inject $250,000 into a "general account" to cover interest payments due through December 31, 2008, Comerica's legal expenses, and other fees, including the closing fee. Also on or before December 29, 2008, Vlahos was to liquidate his financial assets in his Wachovia securities account, execute a security agreement with Comerica on these assets, and ensure that the total transfer amounted to $500,000 by the close of business on December 29, 2008. On or before December 31, 2008, Masters would pay a $52,500 closing fee. On or before January 16, 2009, Pratt was to deposit cash in a Comerica account in order to cover the shortfalls in his $9 million obligation.

> Comerica reserved the right to exercise its rights and remedies under the Forbearance Agreement, and a failure to exercise those rights and

6

remedies was not to "be construed as a waiver or modification of those rights or an offer of forbearance." The Forbearance Agreement stated that Comerica would not be bound, absent an express written waiver by Comerica, until an agreement was met on all issues, "reduced to writing and signed by" Masters, its guarantors, and Comerica. Masters agreed to use its best efforts to procure alternative financing and provide written confirmation of the financing arrangement on or before January 23, 2009. Acceptance of the Forbearance Agreement required that "Borrower and Guarantors . . . properly execute this Agreement and hand deliver [the] same to the undersigned by no later than 12:00 (noon) on December 19, 2008."

Masters signed the Forbearance Agreement on December 19, 2008. On December 22, 2008, a Comerica executive acknowledged receipt of the signed agreement and stated he was "look[ing] forward to the rest of the signatures." After transferring more than $8 million into a Comerica money market account, Guarantor Pratt signed the agreement on December 21, 2008. As Comerica was aware, Vlahos was out of the country and unavailable, so he had not yet signed the Forbearance Agreement.

On December 29, 2008, Comerica sent entitlement orders to Wachovia Securities instructing it to liquidate Vlahos's assets and wire the cash to Comerica. With regard to Vlahos's signature, Comerica sent an e-mail to Masters on December 30, 2008, stating, "[W]e need the attached security agreement signed and the Forbearance signed."

*Masters I*, ¶¶ 20-24. Vlahos had a phone conversation with Curt Howell (Howell), Masters' CEO, on December 29, 2008, in which Vlahos informed Howell that he was on an island and would not be available to print, sign, or fax any of the documents until he returned to the mainland on January 2, 2009. On December 30, 2008, Howell informed Norton of Vlahos's situation, to which Norton responded, "[t]hat's fine." Norton thereafter informed his boss at Comerica, Ernest Zarb (Zarb), that Vlahos would be unavailable to sign any documents until January 2, 2009. On December 31, 2008, just before 5:00 p.m. and without notice, Comerica initiated an offset of the accounts of Masters and its

7

guarantors, seizing nearly $10.5 million from their accounts. The offset of these accounts "precipitated the collapse of the company." *Masters I*, ¶ 25.

¶10 On October 4, 2011, BLDC sued Masters in Montana for failing to pay its obligations under the $200,000 loan agreement. In November 2011, Masters filed an answer to BLDC's complaint as well as a third-party complaint against Comerica. Masters' third-party complaint against Comerica alleged Comerica breached the Forbearance Agreement by initiating the offset on December 31, 2008, after it had bound itself to forbear until February 16, 2009. As Masters could not repay BLDC without successfully recovering against Comerica, BLDC and Masters agreed to cooperate in Masters' litigation against Comerica. Comerica sought to sever the third-party complaint in 2012, but its motion was deemed denied after the District Court failed to rule on the motion. Before trial, Comerica sought partial summary judgment that Michigan law applied. The District Court denied the motion and determined Montana law applied to the case. "The District Court also determined Masters could reference at trial Comerica's receipt of federal Troubled Asset Relief Program (TARP) funds following the 'government bailout' of Comerica, and the availability of such funds for troubled borrowers." *Masters I*, ¶ 29. In January 2014, the District Court held a jury trial. The jury found Masters liable to BLDC in the amount of $275,251.09. The jury also found Comerica liable to Masters in the total amount of $52,037,593. Comerica appealed to this Court, and we reversed the jury's verdict after determining "the prejudicial effect of the TARP evidence requires a new trial." *Masters I*, ¶ 107. We further held the District Court "erred by refusing to apply Michigan law pursuant to the parties' agreement." *Masters I*, ¶ 58. In

accordance with these two conclusions, we reversed the judgment against Comerica and remanded the matter to the District Court "for a new trial on the contract claims, applying Michigan law[.]" *Masters I*, ¶ 108.

¶11 The *Masters I* opinion did not affect the judgment in favor of BLDC against Masters, *see Masters I*, ¶ 109, leaving only Masters' claims against Comerica for retrial. Comerica sought to dismiss the suit based on the doctrine of *forum non conveniens*, arguing Michigan was the proper forum for Masters' claims, but this motion was denied by the District Court. After Comerica moved for—and Masters consented to—a bench trial, the District Court issued an order setting a ten-day bench trial beginning on January 9, 2017. The parties both filed numerous motions regarding numerous issues before the retrial.

¶12 Relevant to this proceeding, on December 19, 2016, the District Court issued a written Order Denying Comerica's Motion for Summary Judgment. This order denied Comerica's motion for summary judgment which had argued the Forbearance Agreement did not comply with Michigan's statute of frauds specific to financial institutions and that no contract to forbear existed because Masters did not complete the conditions of the Forbearance Agreement. The District Court found the Forbearance Agreement complied with the statute of frauds. The District Court additionally found this Court "has determined that there are triable issues of fact on the issue of whether Comerica waived conditions precedent thus giving rise to potential liability of Comerica on the contract sued upon[, ]i.e., the Forbearance Agreement," *see Masters I*, ¶ 91, and was therefore bound by this Court's determination in that regard.

¶13 On January 3, 2017, the District Court issued an Order Denying Pending Motions, which denied: (1) Masters' Motion for Summary Judgment on Comerica's Affirmative Defenses; (2) Comerica's Motion for Summary Judgment Regarding the Letter of Credit Assigned Claims; (3) Comerica's Motion for Partial Summary Judgment Regarding Masters' Alleged UK Profits Damages; (4) Comerica's Motion for Partial Summary Judgment Regarding Masters US Damages; (5) Comerica's Motion for Partial Summary Judgment Regarding Guarantors' Assigned Claims; and (6) Comerica's Motion for Summary Judgment under the Voluntary Payment Doctrine. The case then proceeded to a bench trial.

¶14 Over the course of the trial, the District Court heard testimony from Norton, Richard Tremmel, Derek Rogers, Chad Shepler, Matthew Nolan, Pratt, Christopher Schrichte, Howell, Robert Storey, Van Conway, James Shirely, and Jim Schoettley; received the videotaped depositions of Mark Farnham and Robert Bellgraph; reviewed the previous trial testimony of Mark Debniak; and, in the words of the court, "received hundreds, if not thousands of exhibits at trial." At the close of trial, the District Court ordered the parties to each submit proposed findings of fact and conclusions of law, which they did on May 22, 2017. Comerica filed a Brief in Response to Masters' Proposed Findings of Facts and Conclusions of Law on June 7, 2017.

¶15 The District Court issued its Decision, Findings of Fact & Conclusions of Law on November 8, 2019. The District Court determined the Forbearance Agreement was a contract, Comerica waived Masters' performance of several conditions of the contract, Comerica breached the contract, Masters suffered damages in the amount of

$10,595,514.16, and Comerica did not plead setoff or recoupment of the $10.5 million loan amount so the damage award would not be reduced by that amount. The court further ordered a subsequent hearing was necessary to determine the amount of interest and attorney fees to be awarded—and whether Michigan or Montana law applied to those issues.

¶16 On November 12, 2019, Masters filed its Bill of Costs. Masters sought a total of $177,656.56 in taxable costs and notified the District Court it would later be requesting an award of all costs (including non-taxable costs) and expenses. Comerica filed an objection to Masters' Bill of Costs, asserting Masters sought unauthorized and nonrecoverable costs under both Michigan and Montana law and that Michigan law should govern the recovery of costs. Masters then filed Masters' Motion for an Award of All Costs, in which it sought a total of $512,496.30 in both taxable and non-taxable costs. Comerica filed an objection to this motion as well.

¶17 On November 22, 2019, the District Court issued an Order Setting Briefing Schedule and Hearing, which directed the parties to file simultaneous briefs regarding interest and attorney fees. Masters and Comerica thereafter filed briefs regarding interest and attorney fees, as well as further briefs regarding costs. After briefing was completed, the District Court held a hearing on all pending matters on January 17, 2020. The District Court issued its Decision & Order on Costs, Interest & Attorney Fees on June 12, 2020, in which it performed choice-of-law analyses regarding the issues of costs, interest, and attorney fees. The court found Montana law applied to costs, but denied Masters' request for all costs, including non-taxable costs, and awarded Masters

$176,063.19 in taxable costs. The court then found Michigan law applied to interest and awarded $8,067,405.60 in prejudgment interest. Finally, the court determined Montana law applied to attorney fees and awarded Masters $7,535,593.18 in attorney fees—representing 40% of the $18,838,982.95 total awarded to Masters in damages, costs, and prejudgment interest.

¶18 In accordance with its November 8, 2019 Decision, Findings of Fact & Conclusions of Law and June 12, 2020 Decision & Order on Costs, Interest & Attorney Fees, the District Court entered its Judgment in favor of Masters in the amount of $26,374,576.13—consisting of $10,595,514.16 in damages, $8,067,405.60 in prejudgment interest, $7,535,593.18 in attorney fees, and $176,063.19 in costs—on June 17, 2020. The Judgment included an additional four days of prejudgment interest at the rate of $2,575.80 per day and provided for post-judgment interest at Montana's statutory rate of 10%. The parties cross-appeal numerous rulings of the District Court. Additional relevant facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶19 We review findings of fact entered after a bench trial in a civil action to determine whether they are supported by substantial credible evidence. *In re Estate of Cook*, 2020 MT 240, ¶ 27, 401 Mont. 374, 472 P.3d 1179 (citing *DeNiro v. Gasvoda*, 1999 MT 129, ¶ 9, 294 Mont. 478, 982 P.2d 1002). We review this evidence in the light most favorable to the prevailing party and leave the credibility of witnesses and weight assigned to their testimony to the determination of the district court. *Kurtzenacker v. Davis Surveying, Inc.*, 2012 MT 105, ¶ 14, 365 Mont. 71, 278 P.3d 1002 (citing *Only a Mile, LLP*

*v. State*, 2010 MT 99, ¶ 10, 356 Mont. 213, 233 P.3d 320). We review a district court's conclusions of law to determine whether they are correct. *In re Estate of Cook*, ¶ 27 (citing *DeNiro*, ¶ 9). "Mixed questions of law and fact, including the district court's application of controlling legal principles to its factual findings, are reviewed de novo." *In re Estate of Cook*, ¶ 27 (citing *Barrus v. Mont. First Judicial Dist. Court*, 2020 MT 14, ¶ 15, 398 Mont. 353, 456 P.3d 577). Even when there is a conflict in the evidence, we will uphold a district court's decision where there is substantial credible evidence to uphold its findings of fact and conclusions of law. *Public Land/Water Access Ass'n v. Robbins*, 2021 MT 75, ¶ 23, 403 Mont. 491, 483 P.3d 1102.

¶20 "This Court reviews issues of law—including interpretation of a contract, decisions on choice of law, and summary judgment rulings—de novo." *Masters I*, ¶ 33 (citing *Tidyman's Mgmt. Servs. v. Davis*, 2014 MT 205, ¶ 13, 376 Mont. 80, 330 P.3d 1139). Procedural trial considerations are to be determined under the law of the forum, while substantive questions are to be determined under the law chosen by the parties in a contract. *Masters I*, ¶ 33 (citations omitted).

¶21 We review a district court's grant of prejudgment interest to determine if the district court's interpretation of the law is correct. *Fitterer Sales Mont., Inc. v. Mullin*, 2015 MT 272, ¶ 16, 381 Mont. 107, 358 P.3d 885 (citing *Swank Enters. v. All Purpose Servs., Ltd.*, 2007 MT 57, ¶ 14, 336 Mont. 197, 154 P.3d 52).

¶22 "If legal authority exists to award attorney fees, we review a district court's decision to grant or deny fees for abuse of discretion." *Kenyon-Noble Lumber Co. v. Dependant*

*Founds., Inc.*, 2018 MT 308, ¶ 11, 393 Mont. 518, 432 P.3d 133 (citing *James Talcott Constr. Inc. v. P&D Land Enters.*, 2006 MT 188, ¶ 27, 333 Mont. 107, 141 P.3d 1200).

¶23 We review a district court's order concerning costs for an abuse of discretion. *King v. State Farm Mut. Auto. Ins. Co.*, 2019 MT 208, ¶ 6, 397 Mont. 126, 447 P.3d 1043 (citing *Total Indus. Plant Servs. v. Turner Indus. Group, LLC*, 2013 MT 5, ¶ 61, 368 Mont. 189, 294 P.3d 363). "We review a district court's application of a statute in determining entitlement to costs for correctness." *King*, ¶ 6.

## DISCUSSION

¶24 *1. Is the District Court's determination under Michigan law that Comerica breached the parties' Forbearance Agreement causing Masters to suffer contract damages supported by substantial evidence?*

¶25 Comerica asserts the District Court made numerous errors in its interpretation of, and application of Michigan law to, the Forbearance Agreement. Specifically, Comerica argues a contract could not have been formed because Vlahos never signed; Michigan's statute of frauds bars any claims arising out of the Forbearance Agreement; the District Court could not have found clear and convincing evidence Comerica waived Masters' performance of several provisions of the Forbearance Agreement; and "seizure damages" are not found in Michigan law, so the District Court had no legal basis to award Masters over $10.5 million of "seizure damages." Masters argues we simply need to determine whether the District Court's determination under Michigan law that Comerica breached the Forbearance Agreement and caused Masters to suffer damages is supported by substantial evidence. On appeal, therefore, we are essentially called upon to answer three questions regarding the Forbearance Agreement: (1) whether the Forbearance

14

Agreement was a valid contract which complied with Michigan law; (2) whether Comerica waived performance of some conditions of the Forbearance Agreement; and (3) whether Masters suffered damages due to Comerica's breach of the Forbearance Agreement.

***Contract Formation***

¶26     Comerica asserts both the Forbearance Agreement never came into effect because it was not fully signed and Michigan's statute of frauds relating to financial institutions bans any claim arising out of the Forbearance Agreement as the agreement did not comply with that statute.  We are not persuaded by either argument.

¶27     "The law of the case is an equitable doctrine which provides that when this Court rules on a case and states a principle or rule of law necessary to the decision, our judgment 'becomes the law of the case and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal.'"  *VanBuskirk v. Gehlen*, 2021 MT 87, ¶ 15, 404 Mont. 32, 484 P.3d 924 (quoting *Winslow v. Mont. Rail Link, Inc.*, 2005 MT 217, ¶ 30, 328 Mont. 260, 121 P.3d 506).  The law of the case is binding on both the lower court and this Court in all subsequent proceedings in the same case, regardless of whether the judgment is "later viewed as 'right or wrong.'"  *VanBuskirk*, ¶ 15 (quoting *Anderson v. Border*, 87 Mont. 4, 8, 285 P. 174, 176 (1930)).  An exception to the law of the case doctrine may apply to prevent injustice when our previous decision was based on a manifest error of fact or is otherwise manifestly incorrect.  *VanBuskirk*, ¶ 15 n.15 (citing *Fiscus v. Beartooth Elec. Coop., Inc.*, 180 Mont. 434, 436-37, 591 P.2d 196, 197 (1979)).

¶28     The law of the case is implicated here as we had cause to review the Forbearance Agreement and its formation and compliance with Michigan law in *Masters I*.  As we are

dealing with subsequent proceedings in the same case, our decision in *Masters I* regarding such matters is binding on both the lower court as well as this Court. *VanBuskirk*, ¶ 15. The only exception to applying the law of the case here would be if our previous decision was either based on a manifest mistake of fact or otherwise manifestly incorrect. *VanBuskirk*, ¶ 15 n.15. We cannot find that our decision in *Masters I* meets such a standard, and therefore the law of the case applies.

¶29 We begin with Comerica's assertion any claims by Masters arising from the Forbearance Agreement are barred by Michigan's statute of frauds. Michigan law contains a statute of frauds specific to financial institutions which states:

> An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:
>
> (a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.
>
> (b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.
>
> (c) A promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation.

Mich. Comp. Laws § 566.132(2) (2009). Comerica meets Michigan's statutory definition of a "financial institution," *see* Mich. Comp. Laws § 566.132(3) (2009), and therefore the statute of frauds applies to the Forbearance Agreement.

¶30 In the first appeal of this matter, Comerica argued Masters' claims were statutorily barred by Mich. Comp. Laws § 566.132(2), arguing that any allegations that were

ultimately actions to enforce oral promises could not be brought against a financial institution. While we did not specifically address this statute in our *Masters I* opinion, we did find the District Court—under the laws of both Michigan and Montana—correctly submitted "the companion questions of contract formation and waiver to the jury," *Masters I*, ¶ 92, implicitly holding the Forbearance Agreement was not invalid as a matter of law. This became the law of the case.

¶31    Revisiting the issue now, we cannot find manifest error. Michigan's statute of frauds bars plaintiffs from bringing an action "against a financial institution to enforce the terms of an oral promise to waive a loan provision." *Crown Tech. Park v. D&N Bank, F.S.B.*, 619 N.W.2d 66, 72 (Mich. App. 2000). "By requiring that the 'promise or commitment'—as opposed to some other document—must be in writing and have an authorized signature, it is evident that [Michigan's] Legislature intended to provide financial institutions with a greater degree of protection than that afforded generally under MCL 566.132(1)." *Huntington Nat'l Bank v. Daniel J. Aronoff Living Tr.*, 853 N.W.2d 481, 489 (Mich. App. 2014) (citing *Crown Tech. Park*, 619 N.W.2d at 72). Pursuant to the statute of frauds, "the party seeking to enforce a promise or commitment must present evidence that the promise or commitment itself was reduced to writing and properly signed." *Huntington Nat'l Bank*, 853 N.W.2d at 489. We have that here. Masters is suing to enforce Comerica's written promise and commitment—signed by Norton, an executive who was authorized to bind Comerica—to forbear until February 16, 2019. Masters' lawsuit therefore strictly complies with the plain language of Michigan's statute of frauds. Mich. Comp. Laws § 566.132(2)(b) (2009).

¶32    While Comerica asserts Masters is, in essence, bringing an action to enforce a "promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation," in violation of Mich. Comp. Laws § 566.132(2)(c) (2009), we are not persuaded by this argument. Pursuant to the law of the case, we have already determined that, under Michigan law, "whether the facts of a particular case constitute a waiver is a question of fact." *Masters I*, ¶ 91 (quoting *Sweebe v. Sweebe*, 712 N.W.2d 708, 711 (Mich. 2006)). "Waiver is the intentional abandonment of a known right whereas estoppel may arise even where there is no intention to abandon or relinquish an existing right." *Formall, Inc. v. Cmty. Nat'l Bank*, 360 N.W.2d 902, 905 (Mich. App. 1984) (citing *Dahrooge v. Rochester German Ins. Co.*,143 N.W. 608, 611 (Mich. 1913)). We will not retroactively recast Masters' lawsuit from one seeking to enforce the Forbearance Agreement to one seeking to enforce an oral "promise or commitment to waive" its provisions or some sort of promissory estoppel action such that it would be banned under Michigan law as set forth in *Crown Tech. Park* and its progeny. Accordingly, Masters' lawsuit is not barred by the statute of frauds and the District Court correctly rejected Comerica's argument in this regard.

¶33    The law of the case also applies regarding contract formation and Vlahos's signature. "The party seeking to enforce a contract bears the burden of proving that the contract exists." *AFT Mich. v. Michigan*, 866 N.W.2d 782, 804 (Mich. 2015). In *Masters I*, we found "Comerica's conduct provided a triable dispute about whether it waived the Forbearance Agreement's clause stating the preconditions to contract formation" when it "coordinated with Masters and the guarantors to accept their performance under the

18

Forbearance Agreement" after the signature deadline had passed. *Masters I*, ¶ 89. We further noted Michigan law permits waiving or modifying contract provisions through the course of conduct of the parties. *Masters I*, ¶ 91 (citing *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 253, 261 (Mich. 2003)). As such, the District Court correctly determined the triable issue in this case was whether Comerica waived provisions of the Forbearance Agreement by its conduct, so we turn now to whether Comerica did in fact waive Masters' performance of certain terms of the Forbearance Agreement.

*Waiver*

¶34 After the conclusion of a bench trial, we review the evidence in the light most favorable to the prevailing party and leave the credibility of witnesses and weight assigned to their testimony to the determination of the district court. *Kurtzenacker*, ¶ 14. Similarly, pursuant to Michigan law, an "appellate court cannot assess the credibility of witnesses" because "[w]e have neither seen nor heard them testify." *Bd. of Control of E. Mich. Univ. v. Burgess*, 206 N.W.2d 256, 259 (Mich. App. 1973) (citing *People v. Chadwick*, 4 N.W.2d 45, 46 (Mich. 1942)). Here, the District Court assessed the credibility of the witnesses and we will defer to its determinations in that regard. We are not called upon to reweigh the evidence or assess the credibility of the witnesses, but to determine whether the District Court's findings are "supported by substantial credible evidence." *In re Estate of Cook*, ¶ 27.

¶35 Here again, the law of the case and our decision in *Masters I* applies regarding whether Comerica waived, or could have waived, Masters' performance of conditions of

19

the Forbearance Agreement. Applying Michigan law, we held in *Masters I*, "parties to a contract are free to mutually waive or modify their contract" and "a course of affirmative conduct, particularly when coupled with oral or written representations, can amount to a waiver[.]" *Masters I*, ¶ 91 (quoting *Quality Prods.*, 666 N.W.2d at 253, 261). We further noted, "[t]he presence in a contract of a 'no implied waiver' provision will not necessarily defeat a waiver-by-conduct argument." *Masters I*, ¶ 92 (citing *Formall*, 360 N.W.2d at 905). This is true because "an 'anti-waiver' clause, like any other term in the contract, is itself subject to waiver or modification by course of performance . . . whether such waiver or modification has occurred is a question for the factfinder." *Formall*, 360 N.W.2d at 905 (citation omitted).[1] As we previously determined, whether provisions of the Forbearance Agreement were waived is a question of fact, not a question of law.

¶36 We turn now to the conditions the District Court found Masters completed, Comerica waived or rendered impossible through its words and actions, or had not yet come due. "A basic requirement of contract formation is that the parties mutually assent to be bound." *Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 598 (Mich. 1993). "[T]o determine whether there was mutual assent to a contract, we use an objective test, looking to the expressed words of the parties and their visible acts, and ask whether a

---

[1] The Michigan Supreme Court has never expressly held to the contrary and the unpublished decisions of the Michigan Court of Appeals cited by Comerica in its briefing, which Comerica asserts limit the application of *Quality Prods.* and contractual waiver in cases involving financial institutions, are not binding precedent. Once again, the issue of waiver is bound by the law of the case as our *Masters I* decision was not manifestly wrong. *VanBuskirk*, ¶ 15 n.15.

reasonable person could have interpreted the words or conduct in the manner that is alleged." *Rood*, 507 N.W.2d at 598 (internal quotation marks and citation omitted). "[W]hen a course of conduct establishes by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms, the requirement of mutual agreement has been satisfied." *Quality Prods.*, 666 N.W.2d at 258. "Courts do not favor destruction of contracts because of indefiniteness and hold that uncertainty may be removed by subsequent acts or agreements of the parties." *Band v. Hazel Park Dev. Co.*, 60 N.W.2d 333, 334 (Mich. 1953).

¶37    Waiver may be shown by express declarations, by a course of acts and conduct, or by "neglecting and failing to act as to induce a belief that there is an intention or purpose to waive." *Klas v. Pearce Hardware & Furniture Co.*, 168 N.W. 425, 427 (Mich. 1918) (citation omitted). "Magic words are unnecessary to effectuate a valid waiver[.]" *Patel v. Patel*, 922 N.W.2d 647, 651 (Mich. App. 2018) (citing *Sweebe*, 712 N.W.2d at 712).

¶38    The Forbearance Agreement required "timely, written acceptance by Borrower and Guarantors" of numerous conditions. It further required both Masters and its guarantors, Pratt and Vlahos, to execute the Agreement and "hand deliver" it to Norton "by no later than 12:00 (noon) on December 19, 2008." In spite of the unambiguous terms requiring copies of the signed Forbearance Agreement to be hand-delivered to Norton by no later than noon on December 19, 2008, none of Masters, Pratt, or Vlahos signed and hand-delivered copies by that date. Masters provided Norton with a signed copy, dated December 19, 2008, of its Agreement via email on December 22, 2008. Pratt provided

21

Masters with a signed copy of his Agreement, dated December 21, 2008, via email on December 22, 2008, and informed them the original would be mailed. After Norton received Masters' signed Forbearance Agreement via email on December 22, 2008, he replied simply, via email, "Thanks. Look forward to the rest of the signatures." Norton, Comerica's authorized representative, clearly accepted the signatures of Masters and Pratt both late and via email and expressed acceptance of the further late signature of Vlahos, with no mention such violated the express terms of the Forbearance Agreement or in any way terminated the Forbearance Agreement. Norton later deleted the email in which he told Masters he was looking forward to the rest of the signatures.

¶39 The District Court found Comerica expressly waived strict performance of the Forbearance Agreement in several respects due to Norton's acceptance of, and response to, the late, non-hand-delivered signatures. Reviewing this under Michigan law's "clear and convincing evidence" standard applicable to waiver, *Quality Prods.*, 666 N.W.2d at 258, we agree. Comerica knowingly waived enforcement of the terms requiring "timely, written acceptance" and hand delivery of the Forbearance Agreement by accepting late, non-hand-delivered signatures and directly stating to Masters that it was "look[ing] forward" to the rest of the—already late—signatures.

¶40 Beyond the signature and hand-delivery requirements, the Forbearance Agreement imposed numerous significant conditions on Masters and its guarantors, which we summarized in *Masters I*:

> Masters agreed to deposit $56,204 into Comerica's account, an amount equivalent to the estimated aggregate interest payments due from January 1, 2009, to February 16, 2009. On or before December 29, 2008,

22

Vlahos (or another investor) would inject $250,000 into a "general account" to cover interest payments due through December 31, 2008, Comerica's legal expenses, and other fees, including the closing fee. Also on or before December 29, 2008, Vlahos was to liquidate his financial assets in his Wachovia securities account, execute a security agreement with Comerica on these assets, and ensure that the total transfer amounted to $500,000 by the close of business on December 29, 2008. On or before December 31, 2008, Masters would pay a $52,500 closing fee. On or before January 16, 2009, Pratt was to deposit cash in a Comerica account in order to cover the shortfalls in his $9 million obligation.

*Masters I*, ¶ 21. We also recognized the mutual actions of the parties after Comerica received the late signatures in *Masters I*:

Despite the late signatures by Masters and Pratt, and the lack of a signature from Vlahos—who was out of the country and unavailable, as Comerica was aware—Masters and its guarantors began performing the conditions of the Forbearance Agreement, and Comerica began accepting those performances. Pratt transferred stock accounts in the form of cash into a Comerica bank account, raising his personal guarantee funds to more than $8 million. In order to meet his required $9 million guarantee, Pratt anticipated transferring additional hedge fund proceeds into the Comerica account—funds that Comerica knew would not be available until January 2009. Per its calculations, Comerica estimated that Pratt's guarantee would still have a $60,000 shortfall. In response, Pratt wired that amount into the Comerica account in December to make up for the expected shortfall.

*Masters I*, ¶ 84. Essentially, the Forbearance Agreement required Masters, Pratt, and Vlahos to each perform certain acts and conditions. As Comerica places a large focus on the conditions related to Vlahos, who never signed the Forbearance Agreement, in its argument the Forbearance Agreement was simply an offer to forbear which was not accepted by Masters, we turn to those conditions now.

¶41 Vlahos was out of the country and unavailable to sign any documents until his planned return on January 2, 2009. Comerica was aware of Vlahos' unavailability. *Masters I*, ¶ 84. Per the Forbearance Agreement, Vlahos was required to execute, sign,

23

and hand-deliver his copy of the agreement to Norton by no later than noon on December 19, 2008. He was also required to liquidate his non-cash financial assets in his Wachovia account, execute a security agreement with Comerica on those assets, and ensure the total transfer amounted to $500,000 by December 29, 2008. Vlahos, or another investor, was also to inject $250,000 into a "general account" by December 29, 2008.

¶42 The District Court found, by clear and convincing evidence, Comerica waived the conditions relating to Vlahos in this case. Upon our review of the record, we find substantial, credible evidence supports the District Court's findings and conclusions. After receiving the late signatures from Masters and Pratt, Comerica did not object and affirmatively stated it was "look[ing] forward" to also receiving Vlahos' late signature. When Vlahos, who was on a small island with no ability to sign or fax any documents, still had not signed the Forbearance Agreement by the December 29, 2008 deadline for his performance of certain conditions, Comerica began sending entitlement orders to liquidate Vlahos' account pursuant to the Forbearance Agreement. On December 30, 2008, Masters emailed Norton, seeking an update on the status of documents which Norton had informed Masters Vlahos would need to sign and that Norton would be sending over after Masters did not receive those documents. Norton responded by emailing the documents to Masters and stating, "[w]e need the attached security agreement signed and the Forbearance signed. As far as Dr. Vlahos' Wachovia account, this letter will be forthcoming and does not require his signature. Although it will require him to fax something to his Wachovia broker." Norton then sent Vlahos and his Wachovia broker a letter releasing Comerica's lien on certain shares so the shares could be withdrawn and exchanged for cash to be placed

in Vlahos' Wachovia account under Comerica's exclusive control—allowing Vlahos to perform the injection of capital as required by the Forbearance Agreement. This letter refers to "the Forbearance Agreement dated December 17, 2008, executed by Bank, executed by Masters Group and Larry Pratt, individually and as trustee of his trust, but as yet executed by you ('Forbearance Agreement')."

¶43 Upon review, substantial evidence supports the District Court's determination there was clear and convincing evidence, as of December 30, 2008, Comerica was actively waiving the conditions which required Vlahos to sign by December 19, 2008, inject $250,000 by December 29, 2008, and liquidate his non-cash assets (and execute a security agreement with Comerica) to bring his Wachovia balance to $500,000 by December 29, 2008, as all of those dates had already passed when Norton sent his emails and letters. After Norton was then told by Howell that Vlahos could not sign or fax the documents until his January 2, 2009 return to the country, he told Howell that was "fine" on December 30, 2008, and then informed his boss at Comerica, Zarb, of the situation. Comerica knew full well Vlahos was out of the country and was unavailable to sign or fax the Forbearance Agreement and its related documents. Comerica informed Masters the situation regarding Vlahos was "fine" and sent entitlement orders to Wachovia to accomplish Vlahos' conditions under the Forbearance Agreement. Comerica, through its words and actions, therefore waived Vlahos' strict performance with those conditions until at least January 2, 2009.[2] Prior to January 2, 2009, and without giving Vlahos an

_____

[2] The Dissent asserts Norton's "[t]hat's fine" comment with regard to Vlahos' unavailability to sign documents could have, at most, waived only the signature requirement for Vlahos to sign the

25

opportunity to return to the country, Comerica abruptly stopped forbearing and seized Masters' and the guarantors' collateral.

¶44 Turning to the conditions related to Pratt, we have previously explained Comerica waived strict performance of his signature and hand-delivery requirements by accepting late, emailed signatures. The remaining condition related to Pratt involved him ensuring the balance of his Comerica account was not less than $9 million "at the close of business on January 16, 2009[.]" Comerica seized the collateral well before that date, so Pratt was prevented from meeting this condition by the actions of Comerica. In addition, and as we noted in *Masters I*, Pratt already had over $8 million in his account, had sold a hedge fund for over $900,000—the funds of which would not be available until January—and transferred another $60,000 in cash to the Comerica account to make up for the projected shortfall. *See Masters I*, ¶ 84. Comerica either waived or prevented performance of these conditions relating to Pratt.

---

actual Forbearance Agreement. As we have explained, this conversation took place after the deadlines for Vlahos to sign the agreement, inject $250,000, and liquidate his non-cash assets (and execute a security agreement with Comerica) to bring his Wachovia balance to $500,000 had already passed. As Vlahos was unavailable to even sign the Forbearance Agreement, he was also unavailable to sign any other documents which may have been required to accomplish those conditions. There would be little point to accepting Vlahos' late signature if his other conditions were not actively being waived by Comerica at that point, as their deadlines had already passed. Moreover, upon our appellate review of a bench trial, we are to review the evidence in the light most favorable to the prevailing party and leave the credibility of witnesses and weight assigned to their testimony to the determination of the district court. *Kurtzenacker*, ¶ 14. The District Court had the opportunity to hear the testimony, see the witness, and observe his demeanor and non-verbal communication. The District Court's conclusion as to the meaning of Norton's "[t]hat's fine" response is supported by the evidence, even if an alternate conclusion could likewise have been supported by the evidence of record.

26

¶45 Finally, we now address the conditions related to Masters itself. These conditions required Masters to deposit $56,204 in its Comerica account "[u]pon execution" of the Agreement and pay Comerica a $52,500 closing fee on or before December 31, 2008.[3] As of December 31, 2008, Masters had $96,033.85 in its Comerica Account. The District Court found Comerica waived the "[u]pon execution" deadline for the $56,204 because it repeatedly extended the deadline for Vlahos to execute the Forbearance Agreement. It also found the closing fee condition was both waived by estoppel and had not become due by the time of Comerica's seizure.

¶46 Regarding the $56,204 condition, we agree there is substantial, credible evidence this condition was waived until Vlahos was able to sign. After Comerica accepted Masters' and Pratt's late signatures, Comerica continually extended Vlahos' deadline to sign as he was out of the country and unavailable. Additionally, Masters' Comerica account had more than this amount on December 31, 2008. Still, before the close of business on that day, Comerica swept Masters' accounts and seized its funds—taking more than the $56,204. Regarding the $52,500 closing fee, the very terms of the Forbearance Agreement allowed this to be taken from the $250,000 equity injection to be made by Vlahos or another investor. Comerica and Vlahos' brokers were actively taking steps to inject this additional money while Vlahos was out of the country through the entitlement orders, and Vlahos was

---

[3] An additional condition required Masters to use its best efforts to procure alternative financing to repay the loan by February 16, 2009, with a written confirmation letter indicating it had indeed secured financing due by January 23, 2009. Comerica swept the accounts and destroyed any possibility of Masters' ability to secure refinancing well before the January 23 due date, and therefore prevented Masters from accomplishing this condition.

set to return on January 2, 2009, at which time he could begin signing the documents necessary to accomplish his conditions. "'Where a contract is performable on the occurrence of a future event, there is an implied agreement that the promisor will place no obstacle in the way of the happening of such event, particularly where it is dependent in whole or in part on his own act; and where he prevents the fulfillment of a condition precedent or its performance by the adverse party, he cannot rely on such condition to defeat his liability. [] Hence, the performance of a condition precedent is discharged or excused, and the conditional promise made an absolute one, where the promisor himself [] waives the performance.'" *Mehling v. Evening News Ass'n*, 132 N.W.2d 25, 26 (Mich. 1965) (quoting *Hayes v. Beyer*, 278 N.W. 764, 766 (Mich. 1938)). Comerica, though it repeatedly manifested its intent to waive strict performance of these conditions through its words and actions, nevertheless swept Masters' accounts, precipitating the collapse of the company's U.S. operations. At the time of Comerica's seizure, relevant conditions had either been performed, waived, rendered impossible due to the seizure, or had not yet come due.

¶47 There is no clear error in the District Court's finding that Comerica knowingly and voluntarily waived Masters' strict performance of several terms of the Forbearance Agreement. Upon our review of the record, the evidence of Comerica's waiver of those conditions in this case decidedly meets the "clear and convincing evidence" standard to find waiver under Michigan law. *Quality Prods.*, 666 N.W.2d at 258. The Forbearance Agreement was therefore a binding contract imposing a duty to forbear on Comerica which Comerica breached by seizing the collateral of Masters and its guarantors

well before the forbearance date.[4]  As such, we turn now to whether Masters was damaged by Comerica's breach.

***Damages***

¶48    In a breach of contract action, the damages recoverable are "those damages that arise naturally from the breach, or which can reasonably be said to have been in contemplation of the parties at the time the contract was made." *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980).  "A party to a contract who is injured by another's breach of the contract is entitled to recover from the latter damages for only such injuries as are the direct, natural, and proximate result of the breach." *Farm Credit Servs., P.C.A. v. Weldon*, 591 N.W.2d 438, 446 (Mich. App. 1998) (citation omitted).  "The object of the measure of damages in a breach of contract suit is to place the injured party in as good a position as he would have been in if the promised performance had been rendered." *Allen v. Mich. Bell Tel. Co.*, 232 N.W.2d 302, 305 (Mich. App. 1975).

¶49    Comerica argues the District Court erred by awarding Masters' so-called "seizure damages" and therefore failing to award damages on a "net" basis, which would reduce Masters' $10,595,514.16 award by the $10.5 million it owed Comerica under the

---

[4] The Dissent raises an argument not made by Comerica that the Forbearance Agreement made it easier to foreclose because Comerica can do it if, for any reason, it believes the prospect of payment or performance is impaired.  Comerica did not give a stated reason before it seized Masters' collateral, rather it just seized the money (while representing it would not do so) and has, for nearly ten years in litigation, consistently claimed the Forbearance Agreement was never a contract.  Under the defense brought and argued by the Dissent, Comerica would have a heads it wins, tails it also wins situation, if Comerica can just seize the money whenever it wants and then have a reviewing court point to this "belief" clause afterwards, regardless of Comerica's previous words and actions regarding this matter.

loan. Masters asserts the District Court, regardless of the nomenclature used in its Decision, Findings of Fact & Conclusions of Law, correctly awarded damages both in procedure and in amount. We agree with Masters.

¶50 The District Court found Comerica seized $10,595,514.16 from Masters between December 31, 2008 and March 3, 2009, consisting of: $96,033.85 from Masters' Comerica account; $8,000,742.31 from Pratt's Comerica account; $51,482.26 from Pratt's Comerica account; $31,704.77 from Vlahos's accounts; $500,000 from Nolan's Letter of Credit; $475,000 from Vlahos's accounts; $500,000 from Taylor's Letter of Credit; $940,548.18 from Pratt's Hedge Fund; and $2.79 as Miscellaneous Debt. Masters' collateral can "reasonably be said to have been in contemplation of the parties" at the time of the Forbearance Agreement, as the Forbearance Agreement was an agreement to forbear on seizing Masters' collateral. *Kewin*, 295 N.W.2d at 55. Masters is therefore allowed to recover those damages, and the amount here is certain—$10,595,514.16.

¶51 Comerica's argument the damage award must be reduced by the value of the loan is unpersuasive under the facts of this case. As we will discuss later, Comerica never affirmatively pled a claim or defense for setoff or recoupment, and in fact, affirmatively stated it was not doing so at the District Court. Comerica briefed, and Norton testified at trial, Masters owed Comerica nothing once the seizure of collateral was completed, such that a reasonable factfinder could determine it was impossible for Masters to secure alternate financing to pay off the Comerica loan.

¶52 Under Michigan law, "[d]amages for lost profits are based on the loss of net rather than gross profits." *Lawton v. Gorman Furniture Corp.*, 282 N.W.2d 797, 801 (Mich. App.

1979) (citations omitted).  Here, the District Court rejected—as we will explain later, correctly—Masters' claim for lost profits because it was not profitable at the time Comerica caused its collapse by seizing the collateral.  The District Court was therefore not required by Michigan law to award "net" damages, but was required to award "those damages that arise naturally from the breach, or which can reasonably be said to have been in contemplation of the parties at the time the contract was made." *Kewin*, 295 N.W.2d at 55. The damages arising naturally from Comerica's breach of the Forbearance Agreement are the funds Comerica wrongfully seized.  Comerica's wrongful seizure here "precipitated the collapse of the company." *Masters I*, ¶ 25.  Masters is clearly entitled to the return of its wrongfully seized assets as damages from Comerica's breach of contract.   The District Court did not err in refusing to calculate a net damage award, and as we will discuss in Issue 2, Comerica was required to affirmatively plead setoff or recoupment if it sought to recover the $10.5 million loan proceeds from Masters.  Though it termed its award as one for "seizure damages," a term which does not appear to exist in Michigan law, the District Court's ultimate determination the Forbearance Agreement was a contract, breached by Comerica wrongfully initiating the offset of Masters' collateral, causing Masters to suffer damages in the amount of $10,595,514.16 is correct and is affirmed.

¶53     *2. Absent any effort by Comerica to plead or prove a claim or defense for setoff or recoupment, is the District Court's rejection of such a post-trial argument legally correct?*

¶54     Procedural trial considerations, such as Montana's pleading requirements and Rules of Civil Procedure, are governed by Montana law in this case.  *Masters I*, ¶ 33.  We have long held that a party waives an issue when it does not raise an issue in the pleadings,

present argument on the issue, or move to amend the pleadings at the District Court. *Nason v. Leistiko*, 1998 MT 217, ¶ 18, 290 Mont. 460, 963 P.2d 1279 (citation omitted).

¶55 As discussed above, the District Court did not err when it held the Forbearance Agreement was a contract which was breached by Comerica, causing Masters to suffer damages. Comerica now asserts the District Court erred by failing to deduct the $10.5 million loan from any damage award, such that the net damage award would be reduced by that amount. The District Court rejected this argument, finding Comerica both did not plead setoff or recoupment and that Comerica admitted it did not seek setoff or recoupment. We have already addressed Comerica's "net damages" argument above, so we need only address whether Comerica did, in fact, plead or prove a claim or defense for setoff or recoupment before or at trial. Under the facts of this case, we cannot find Comerica did plead or prove such a defense.

¶56 Comerica did not raise a defense of setoff or recoupment in its pleadings. Indeed, it specifically informed the District Court it "did not plead and does not assert a defense of setoff or recoupment." Comerica informed the court it did not plead setoff or recoupment because "Comerica and Masters do not currently owe each other money[.]" Comerica challenged the damage calculations of Storey, alleging he failed to account for the ultimate repayment of the loan, but never affirmatively pled a theory it was entitled to such a recovery in this matter. Typically, admissions such as these would be fatal to Comerica's claim it is entitled to repayment of the loan in these proceedings; however, Comerica now asserts it did raise the issue of the ultimate repayment of the $10.5 million loan in the pretrial order, which supersedes the pleadings. "The pretrial order supersedes the

pleadings, states the issues to be tried, and controls the subsequent course of the action." *Ganoung v. Stiles*, 2017 MT 176, ¶ 28, 388 Mont. 152, 398 P.3d 282 (citing *Craig v. Schell*, 1999 MT 40, ¶ 44, 293 Mont. 323, 975 P.2d 820).

¶57 Our review of the record does not support Comerica's theory that it sufficiently raised the specific defense of setoff or recoupment in the pretrial order. Comerica repeatedly informed the court it was not asserting such a defense and that Masters did not owe Comerica anything. Comerica made no counterclaims against Masters or its guarantors seeking an offset in the event of a judgment in favor of Masters, though this litigation has been occurring for nearly ten years. Such a counterclaim for recoupment or set-off is required under Rule 13 of the Montana Rules of Civil Procedure. *Mattson v. Julian*, 209 Mont. 48, 54, 678 P.2d 654, 657 (1984). By failing to specifically plead a defense of setoff or recoupment in this case, Comerica "failed to follow the simple pleading procedures designed to give notice to the opposing party and to narrow the issues for trial." *Mattson*, 209 Mont. at 54, 678 P.2d at 658 (citing *Tobacco River Lumber Co., Inc. v. Yoppe*, 176 Mont. 267, 270, 577 P.2d 855, 856 (1978)). An oblique reference to future repayment in the pretrial order does not meet Montana's pleading requirements and the District Court was correct to reject Comerica's arguments in this regard. As it correctly rejected Comerica's "net damages" theory, the District Court also correctly found Comerica did not affirmatively plead a defense of setoff or recoupment.

¶58 *3. Is the District Court's determination under Michigan law that Masters is entitled to prejudgment interest legally correct and does the amount exceed the bounds of reason?*

¶59 Both parties agreed, and the District Court found, Michigan law applied to any award of prejudgment interest. Where Masters and Comerica differ, however, is in what subsection of Michigan's prejudgment interest statute applies to the present case. We begin with the relevant portions of that statute:

(1) Interest is allowed on a money judgment recovered in a civil action, as provided in this section. However, for complaints filed on or after October 1, 1986, interest is not allowed on future damages from the date of filing the complaint to the date of entry of the judgment. As used in this subsection, "future damages" means that term as defined in section 6301.

. . .

(6) For a complaint filed on or after January 1, 1987, but before July 1, 2002, if the civil action has not resulted in a final, nonappealable judgment as of July 1, 2002, and if a judgment is or has been rendered on a written instrument that does not evidence indebtedness with a specified interest rate, interest is calculated as provided in subsection (8).

(7) For a complaint filed on or after July 1, 2002, if a judgment is rendered on a written instrument evidencing indebtedness with a specified interest rate, interest is calculated from the date of filing the complaint to the date of satisfaction of the judgment at the rate specified in the instrument if the rate was legal at the time the instrument was executed. If the rate in the written instrument is a variable rate, interest shall be fixed at the rate in effect under the instrument at the time the complaint is filed. The rate under this subsection shall not exceed 13% per year compounded annually.

(8) Except as otherwise provided in subsections (5) and (7) and subject to subsection (13), for complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action is calculated at 6-month intervals from the date of filing the complaint at a rate of interest equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this section. Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs. In an action for medical malpractice, interest under this subsection on costs or attorney fees awarded under a statute or court rule is not calculated for any period before the entry of the judgment. The amount of interest attributable to that part of

34

the money judgment from which attorney fees are paid is retained by the plaintiff, and not paid to the plaintiff's attorney.

Mich. Comp. Laws § 600.6013 (2019). Mich. Comp. Laws § 600.6013(13) (2019) applies to settlement offers in tort cases and is not implicated here. The District Court determined Mich. Comp. Laws § 600.6013(7) (2019) applied and awarded Masters prejudgment interest in accordance with that subsection. On review, we are called upon to determine whether the District Court's interpretation of the law is correct. *Fitterer*, ¶ 16. We find the District Court correctly applied Mich. Comp. Laws § 600.6013(7) (2019) and affirm its award of prejudgment interest in the amount of $8,067,405.60.

¶60 Much of the dispute regarding prejudgment interest in this case comes down to an alleged typo in Comerica's briefing, in which it asserted Mich. Comp. Laws § 600.6013(6) (2019) applied to the case. The District Court, in its Decision & Order on Costs, Interest & Attorney Fees, found Comerica's argument regarding prejudgment interest "not on point" because it cited to Mich. Comp. Laws § 600.6013(6) (2019), which only applies to cases "filed on or after January 1, 1987, but before July 1, 2002[.]" Mich. Comp. Laws § 600.6013(6) (2019) calls for prejudgment interest to be "calculated as provided in subsection (8)." Therefore, regardless of whether Comerica put forth Mich. Comp. Laws § 600.6013(6) (2019) or Mich. Comp. Laws § 600.6013(8) (2019) in its briefing, it was essentially arguing prejudgment interest was to be calculated according to Mich. Comp. Laws § 600.6013(8) (2019). By its plain language, Mich. Comp. Laws § 600.6013(8) (2019) can only apply, however, if Mich. Comp. Laws § 600.6013(7) (2019) does not. The

35

District Court found Mich. Comp. Laws § 600.6013(7) (2019) did in fact apply under the facts of this case, and we agree.

¶61    At the start, we note the purpose of Michigan's prejudgment interest statute "is to compensate the prevailing party for loss of use of the funds awarded as a money judgment and to offset the costs of litigation" and an award of prejudgment interest "is mandatory in all cases to which the statute applies." *Rodriguez v. Farmers Ins. Grp. of Cos.*, 651 N.W.2d 428, 432 (Mich. App. 2002) (citations omitted). Mich. Comp. Laws § 600.6013 is remedial in nature and "should be liberally construed in favor of the prevailing party." *Markley v. Oak Health Care Inv'rs of Coldwater, Inc.*, 660 N.W.2d 344, 350 (Mich. App. 2003).

¶62    "MCL 600.6013(7) applies when certain criteria are met: the judgment must be 'rendered on' a written instrument, the instrument must evidence indebtedness, and there must be a specified interest rate." *Wyandotte Elec. Supply Co. v. Elec. Tech. Sys.*, 881 N.W.2d 95, 107-08 (Mich. 2016). A judgment in a breach of contract claim can be said to be "rendered on the contract." *Wyandotte Elec. Supply Co.*, 881 N.W.2d at 108. Here, judgment was rendered in favor of Masters after Comerica breached the Forbearance Agreement. The Forbearance Agreement, and its Addendum, is a written instrument. The Forbearance Agreement evidences indebtedness, though it must be said the indebtedness evidenced was that Masters was indebted to Comerica. Finally, the Forbearance Agreement, and its Addendum, specifies what interest rates apply. It would appear by the plain language of the statute the Forbearance Agreement meets the requirements of Mich. Comp. Laws § 600.6013(7) (2019).

¶63 Comerica argues since the Forbearance Agreement evidences Masters' indebtedness to Comerica, rather than the other way around, it cannot be said to meet the "evidence indebtedness" requirement. We do not find Michigan's prejudgment interest statute imposes a requirement the evidence of indebtedness must be shown to flow in a certain direction before Mich. Comp. Laws § 600.6013(7) (2019) applies. If Michigan's legislature had intended to make the prejudgment interest statute operate in such a manner, it certainly could have required subsection (7) to apply only to judgments rendered on a written instrument evidencing indebtedness *to the prevailing party* with a specified interest rate. By the plain language of the statute, it did not. In light of Michigan's requirement that its prejudgment interest statute be "liberally construed" in favor of Masters, the District Court's determination Mich. Comp. Laws § 600.6013(7) (2019) applied is correct. *Fitterer*, ¶ 16.

¶64 Comerica also asserts that, even if Mich. Comp. Laws § 600.6013(7) (2019) applied, the District Court erroneously chose the wrong interest rate under that statute. We disagree. Comerica provided the Affidavit of Karl R. Norton, in which he calculated the applicable interest rate "based on interest rates set out in the Forbearance Agreement and Addendum thereto[.]" This affidavit calculated interest rates by using three separate interest rates as specified in the Agreement and Addendum. The District Court ultimately used Comerica's calculations when awarding prejudgment interest pursuant to Mich. Comp. Laws § 600.6013(7) (2019) and chose the highest rate among the three provided.[5] As the

---

[5] This interest rate was provided to come into effect "from and after the occurrence of any default under the forbearance agreement" pursuant to the language of the Addendum. While we have

37

prejudgment interest statute is to be "liberally construed in favor of the prevailing party," *Markley*, 660 N.W.2d at 432, we do not find error in the District Court's choice here.

¶65    The District Court is affirmed in both its determination Mich. Comp. Laws § 600.6013(7) (2019) applied and its calculations under that statute. Accordingly, the award of $8,067,405.60 in prejudgment interest is affirmed.

¶66    *4. Is the District Court's determination under Montana law that Masters is entitled to attorney fees legally correct?*

¶67    "Montana generally follows the American Rule regarding attorney fees, 'where each party is ordinarily required to bear his or her own expenses absent a contractual or statutory provision to the contrary.'" *Mlekush v. Farmers Ins. Exch.*, 2015 MT 302, ¶ 10, 381 Mont. 292, 358 P.3d 913 (*Mlekush I*) (quoting *Winter v. State Farm Mut. Auto. Ins. Co.*, 2014 MT 168, ¶ 31, 375 Mont. 351, 328 P.3d 665). Similarly, in Michigan, "it is well-settled that the recovery of attorney fees is governed by the 'American rule'" which bars recovery of attorney fees "unless recovery is expressly authorized by statute, court rule, or a recognized exception." *Johnson v. USA Underwriters*, 936 N.W.2d 834, 847 (Mich. App. 2019) (citations omitted).

¶68    Whether under Montana or Michigan law, attorney fees are generally not allowed unless expressly authorized by statute, contract, or another recognized exception. Here,

---

determined Masters was not in default under the Forbearance Agreement at the time Comerica swept Masters' accounts, Comerica's seizure itself breached the contract and constructively defaulted Masters. Comerica is not entitled to later benefit from its wrongful actions by receiving a lower interest rate under Michigan's prejudgment interest statute after nearly a decade of litigation ultimately determines Masters was not in default on December 31, 2008. Liberally construing the prejudgment interest statute in favor of Masters, as Michigan law requires, *Markley*, 660 N.W.2d at 432, leads to the inescapable conclusion the "default" interest rate should apply in this case.

the Forbearance Agreement contained an attorney fees provision, though it was not a reciprocal one. This matters greatly as Montana does not allow non-reciprocal attorney fee provisions in contracts, while Michigan does. The District Court performed a choice-of-law analysis and ultimately determined Montana law should apply to the issue of attorney fees. We review the District Court's choice-of-law decision de novo, *Masters I*, ¶ 33, and conclude the District Court's determination Montana law applied to attorney fees is incorrect.

¶69 Condition 10 of the Forbearance Agreement contains the attorney fee provision, and states, in full:

> Borrower and Guarantors acknowledge and agree the Loan Documents presently provide for and they shall reimburse for any and all costs and expenses of Bank, including, but not limited to, all inside and outside counsel fees of Bank whether in relation to drafting, negotiating or enforcement or defense of the Loan Documents or this Agreement, including any preference or disgorgement actions as defined in this agreement and all of Bank's audit fees, incurred by Bank in connection with the Liabilities, Bank's administration of the Liabilities and/or any efforts of Bank to collect or satisfy all or any part of the Liabilities. Borrower and Guarantors shall immediately reimburse bank for all of Bank's costs and expenses upon Bank's incurrence thereof or upon demand.

As is evident here, the plain language of this condition is not reciprocal and calls only for the reimbursement of Comerica's attorney fees. Under Montana law, this language would be statutorily reciprocal:

> Except as provided in subsection (2), whenever, by virtue of the provisions of any contract or obligation in the nature of a contract made and entered into at any time after July 1, 1971, one party to the contract or obligation has an express right to recover attorney fees from any other party to the contract or obligation in the event the party having that right brings an action upon the contract or obligation, then in any action on the contract or obligation all parties to the contract or obligation are considered to have the same right to

39

recover attorney fees and the prevailing party in any action, whether by virtue of the express contractual right or by virtue of this section, is entitled to recover reasonable attorney fees from the losing party or parties.

Section 28-3-704(1), MCA. Michigan law contains no such reciprocity statute.

¶70 In *Masters I*, we concluded "that Masters and Comerica negotiated a clear and unambiguous choice-of-law provision that is neither against Montana public policy nor against public morals." *Masters I*, ¶ 58. In addition, we recognized the "case involves a large-scale financial transaction negotiated between two sophisticated and counselled entities that had an ongoing business relationship over two years. It is reasonable under these circumstances to infer that Masters and Comerica intended the choice-of-law provision to apply to *all disputes* arising out of their dealings." *Masters I*, ¶ 63 (emphasis added). We further "conclude[d] that Michigan law should have governed *all of* Masters' claims pursuant to the Forbearance Agreement's effective choice-of-law provision." *Masters I*, ¶ 64 (emphasis added).

¶71 In the face of these plain statements in which we determined Michigan law applied to *all* disputes regarding the Forbearance Agreement—which would necessarily encompass the Forbearance Agreement's attorney fees clause—the District Court nevertheless found *Masters I* "does not compel the application of Michigan law" to the attorney fees provision and performed a lengthy choice-of-law analysis to determine Montana law applied. It was unnecessary for the District Court to perform such an analysis, because the law of the case, as determined in *Masters I*, was that Michigan law applied to all disputes, including attorney fee disputes, arising from the Forbearance Agreement. The District Court, regardless of whether it viewed our decision as "wrong" because it did not

40

account for Michigan's lack of a reciprocal attorney fees statute, was not free to simply set our decision aside under the law of the case doctrine. *VanBuskirk*, ¶ 15. Pursuant to *Masters I*, Michigan law applies to any claim for attorney fees arising out of the Forbearance Agreement.

¶72 "If legal authority exists to award attorney fees, we review a district court's decision to grant or deny fees for abuse of discretion." *Kenyon-Noble Lumber Co.*, ¶ 11. Here, there is no legal authority to award Masters' attorney fees. Because there is no authority to award attorney fees under the contract, and, as the contract is governed by Michigan law and therefore Montana's reciprocal attorney fees statute, § 28-3-704(1), MCA, does not apply, the District Court was without legal authority to award attorney fees. Without such legal authority for an award, its determination Masters was entitled to attorney fees in this case was an abuse of discretion and must be reversed.

¶73 Ultimately, the District Court erred when it applied Montana law to the issue of attorney fees in the face of the Forbearance Agreement's express choice-of-law clause which stated Michigan law applied and our decision in *Masters I*. As the Forbearance Agreement does not provide for Masters to recover attorney fees, and Michigan does not have a reciprocal attorney fees statute, the District Court erred by awarding Masters attorney fees. The District Court's award of $7,535,593.18 in attorney fees to Masters is reversed.

41

¶74 *5. Was Masters entitled under Michigan law to recover damages for lost profits or the lost value of the United Kingdom business?*

¶75 The District Court held it was "unpersuaded by Masters' arguments for lost profits or the lost value of U.K. Masters" because Masters was unable to prove the amounts with a reasonable certainty. On cross-appeal, Masters asserts the District Court erred by rejecting those awards due to that uncertainty. We agree with the District Court and are not persuaded by Masters' argument with regard to either Masters' potential lost profits or the lost value of the U.K. business.

¶76 Pursuant to Michigan law, "[l]ost profits, if properly proved, are a proper element of damages." *Allen*, 232 N.W.2d at 305 (citing *Brodsky v. Allen Hayosh Indus., Inc.*, 137 N.W.2d 771, 774 (Mich. App. 1965). "However, before lost profits are recoverable there must be a reasonable degree of certainty for the calculations as opposed to their being conjectural or speculative." *Allen*, 232 N.W.2d at 305 (citations omitted). While "mathematical certainty is not required," and lost profits which are "difficult to calculate" may be awarded by a court, the losses must still be "subject to a reasonable degree of certainty[.]" *Bonelli v. Volkswagen of Am., Inc.*, 421 N.W.2d 213, 226 (Mich. App. 1988) (citation omitted).

¶77 Our review of the record shows the District Court correctly rejected Masters' lost profit argument as it was far too speculative. Masters points to the testimony of Storey at trial, in which he calculated Masters would have obtained future profits in the amount of $4,009,727 from North American operations and $10,610,779 from the existing U.K. operations. Storey's methods and calculations were disputed by Conway at trial. The

District Court heard these conflicting stories and was in the best position to assess the credibility of each witness. *Bd. of Control of E. Mich. Univ.*, 206 N.W.2d at 259. The District Court was thereafter unpersuaded by Masters' evidence and arguments, specifically noting "Masters' admitted challenging cashflow[.]" While Masters reported the profits of its U.K. subsidiary on its taxes, it is undisputed that Masters itself—the North American business—made no profits, and in fact lost money each year it was in operation. A party generally needs to have past profits to prove loss of future profits. *See Joerger v. Gordon Food Serv.*, 568 N.W.2d 365, 370 (Mich. App. 1997). To award Masters damages for future lost profits under the particular circumstances here would be simply speculation and guesswork, which is not allowed. *Fera v. Vill. Plaza, Inc.*, 242 N.W.2d 372, 374 (Mich. 1976) (citations omitted). The District Court correctly denied Masters' claim for lost profit damages.

¶78 As an alternative claim, Masters asserts it is entitled to recover the value of the U.K. business, which went into administration on June 11, 2010, and was ultimately dissolved. The District Court found the causal connection between Comerica's breach of the Forbearance Agreement and the downfall of the U.K. business to be unsubstantiated. We agree. Masters' U.K. subsidiary, Masters Group Holdings LTD, continued to operate after Comerica seized Masters' U.S. collateral. In its letter to stakeholders announcing it was entering administration in the U.K., it even noted it made an "operating profit" in 2010. The U.K. business had its own banking and financing through Fortis Bank in Europe, which requested the U.K. business find a new bank. In January of 2010, Fortis made the decision to reduce the import credit line of the business by £1.5 million. The U.K. business was

43

unable to find a new bank for a myriad of reasons, including a European sovereign debt crisis which devalued both the Euro and the pound sterling. At trial, Rogers testified the (profitable) U.K business was sending money to the (unprofitable) U.S. business as soon as it was acquired by Masters. While Masters presented a reasonable certainty of the value of the U.K. business, its argument Comerica caused the collapse of the U.K. business was far too speculative and was appropriately rejected by the District Court. This is especially true in a situation where the U.K. business entered administration over a year and a half after Comerica seized the U.S. collateral, and only after the U.K. business was unable to move its European banking operations after its European bank reduced its credit line and told it to find a new bank.

¶79 *6. Is Masters entitled to recover all costs, not just statutory costs?*

¶80 At the District Court level, Comerica asserted Michigan law applied to any award of costs. Masters contended Montana law applied. The District Court performed a choice-of-law analysis and ultimately determined Montana law applied to an award of costs. On appeal, Comerica does not argue the District Court erred in applying Montana, rather than Michigan, law to costs. As such, we review Masters' cross-appeal regarding costs pursuant to Montana law.

¶81 As a general rule, the award of costs to a prevailing litigant is governed by statute in Montana and includes a requirement that the party claiming costs submit a memorandum of costs within five days:

> The party in whose favor judgment is rendered and who claims the party's costs shall deliver to the clerk and serve upon the adverse party, within 5 days after the verdict or notice of the decision of the court or referee or, if the entry

44

of the judgment on the verdict or decision is stayed, then before the entry is made, a memorandum of the items of the party's costs and necessary disbursements in the action or proceeding. The memorandum must be verified by the oath of the party, the party's attorney or agent, or the clerk of the party's attorney, stating that to the best of the person's knowledge and belief, the items are correct and that the disbursements have been necessarily incurred in the action or proceeding.

Section 25-10-501, MCA.

¶82 Taxable costs, which are required to be listed in the memorandum of costs, are similarly governed by statute:

A party to whom costs are awarded in an action is entitled to include in the party's bill of costs the party's necessary disbursements, as follows:

(1) the legal fees of witnesses, including mileage, or referees and other officers;

(2) the expenses of taking depositions;

(3) the legal fees for publication when publication is directed;

(4) the legal fees paid for filing and recording papers and certified copies of papers necessarily used in the action or on the trial;

(5) the legal fees paid stenographers for per diem or for copies;

(6) the reasonable expenses of printing papers for a hearing when required by a rule of court;

(7) the reasonable expenses of making transcript for the supreme court;

(8) the reasonable expenses for making a map or maps if required and necessary to be used on trial or hearing; and

(9) other reasonable and necessary expenses that are taxable according to the course and practice of the court or by express provision of law.

Section 25-10-201, MCA.

¶83 In its cross-appeal, Masters asserts it is entitled to an award for all of its costs—$512,496.30—not just the $176,063.19 in statutory costs the District Court awarded. Masters argues the Forbearance Agreement provides for an award of "all costs and expenses" to the prevailing party. Masters cites to Condition 10 of the Forbearance Agreement for this contention and asserts the language of Condition 10—which would award costs and expenses only to Comerica by its plain language—is reciprocal, and therefore Masters is entitled to be reimbursed for all costs pursuant to Montana's reciprocal attorney fees statute, § 28-3-704(1), MCA. "Section 25-10-201, MCA, enumerates the types of costs 'generally allowable' in a party's bill of costs, but we have long held that the list of items in that section 'is exclusive *except as to cases taken out of its operation* by special statute, by stipulation of parties, or by rule of court.'" *Total Indus. Plant Servs.*, ¶ 64 (emphasis in original) (quoting *Roseneau Foods v. Coleman*, 140 Mont. 572, 580, 374 P.2d 87, 91 (1962)).

¶84 Masters, citing to *Weinberg v. Farmers State Bank*, 231 Mont. 10, 32, 752 P.2d 719, 733 (1988), *superseded by statute on other grounds*, § 27-1-220(1), MCA, *as recognized in Folsom v. Mont. Pub. Emps. Ass'n*, 2017 MT 204, ¶ 52, 388 Mont. 307, 400 P.3d 706, asserts a right to both attorney fees and costs under the contract. In *Weinberg*, we noted that "[u]nder Section 28-3-704, MCA, the right to attorney fees is reciprocal to all parties to the contract in any action based on the contract, when the contract provides for attorney fees to any of the parties. Thus, the Weinbergs having successfully defended against the Bank's claim on its promissory notes are entitled in this case to reasonable attorney fees and costs." *Weinberg*, 231 Mont. at 32, 752 P.2d at 733 (internal citation

omitted).  The contract clause at issue in *Weinberg* stated, "[t]he makers, endorsers, and guarantors severally agree to pay a reasonable attorney fee if this notice is placed in the hands of an attorney for collection after maturity, and waive demand, protest, notice of protest, and notice of dishonor."  *Weinberg*, 231 Mont. at 33, 752 P.2d at 733.  The remainder of our *Weinberg* opinion dealt with the amount of the attorney fees to be awarded to Weinberg, without discussion of the Weinbergs' costs.  *See Weinberg*, 321 Mont. at 33-36, 752 P.2d at 733-36.  The Court ultimately upheld an attorney fee award of $12,500 when the Weinbergs were "faced with attorney fees amounting to $91,531.53[.]" *Weinberg*, 231 Mont. at 35, 752 P.2d at 735.

¶85    We do not find *Weinberg* provides support for Masters here, because the plain language of Montana's reciprocal attorney fees statute does not apply to costs.  Costs are governed by their own statutes and procedures in Montana.  *See generally In re Estate of Lande*, 1999 MT 179, ¶¶ 20-23, 295 Mont. 277, 983 P.2d 316.  While parties may enter into a stipulation allowing costs regardless of statutory authority, *Total Indus. Plant Servs.*, ¶ 64, the plain language of the Forbearance Agreement allowed only for the recovery of Comerica's costs.  Masters' argument this language is reciprocal is unavailing in the face of our determination the attorney fees portion of the Forbearance Agreement is not reciprocal under Michigan law, which governs interpretation of that contract.  Allowing Masters to recover its non-taxable costs pursuant to the contract language we have already found not to be reciprocal would lead to an absurd result and Masters' claim for non-taxable costs was correctly rejected by the District Court.

¶86    The District Court correctly interpreted Montana's statutes in determining which costs to which Masters was entitled and did not abuse its discretion in limiting Masters' award of costs to the $176,063.19 allowed by statute.

**CONCLUSION**

¶87    We reverse the District Court's award of $7,535,593.18 in attorney fees to Masters. In all other respects, the orders of the District Court are affirmed.

¶88    Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR

Justice Jim Rice, dissenting.

¶89    Comerica and Amicus Montana Bankers Association extensively argue that Masters' claims based upon the putative Forbearance Agreement are barred as a matter of law under the Michigan statute of frauds regarding financial institutions, which prohibits legal actions to enforce financial "promises or commitments" by a bank "unless the promise or commitment is in writing and signed with an authorized signature by the financial institution." Mich. Comp. Laws § 566.132(2). However, Masters here seeks to enforce a signed written agreement against Comerica, and despite the waiver issue

48

advanced by Masters to excuse performance of formative conditions of the Agreement, the claim here is nonetheless distinguished from any prior application of the Michigan statute revealed either in the parties' briefing or my research. In other words, the Michigan statute has not heretofore been applied to prohibit claims of this nature in a published decision. Therefore, I agree with the District Court's and this Court's conclusion that Masters' claims were not statutorily barred under application of Michigan law. Opinion, ¶ 31.

¶90 I disagree with the District Court's determination, affirmed by the Court, that upon this record it was established that Comerica's actions waived, or Comerica was estopped from requiring, written formative conditions of the Forbearance Agreement. The evidentiary standard for waiver under Michigan law is high: there must be mutuality of intent proven upon clear and convincing evidence. *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 253 (2003). This is the standard to be applied, not only to the asserted waiver of the written conditions for formation of the Forbearance Agreement, but to the written "no implied waiver" condition. The Court's opinion in *Comerica I* stated, "[t]he presence in a contract of a 'no implied waiver' provision will not necessarily defeat a waiver-by-conduct argument." *Masters Grp. Int'l, Inc. v. Comerica Bank*, 2015 MT 192, ¶ 92, 380 Mont. 1, 352 P.3d 1101 (citing *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 360 N.W.2d 902, 905 (Mich. Ct. App. 1984)). Not necessarily, but it certainly could. And, under Michigan law, in most cases it would. As the *Formall* Court went on to explain, there is a "strong reluctance by Michigan courts to find waiver or estoppel *except under the most compelling circumstances*." *Formall*, 360 N.W.2d at 906 (emphasis added). This is particularly true in the context of "a major transaction, involving

49

international commerce, international banking, millions of dollars and sophisticated parties with legal counsel," in which Comerica repeatedly stated in writing that any future agreement could not be founded upon the parties' actions and conversations. *Comerica I*, ¶¶ 119-21 (Rice, J., concurring and dissenting).[1] As Amicus Bankers explains:

> These provisions [requiring written waiver and reserving foreclosure rights] are not unique to Comerica. They are standard terms in the banking world used to ensure that, if a work-out is unsuccessful, the bank has not forfeited its ability to collect the promised repayment. Few banks would survive without such conditions. *Every work-out negotiation would be used by borrowers to claim modification of waiver—an untenable result.*

(Emphasis added.)

¶91 The Court notes the multiple conditions that Comerica required to be satisfied for entering the Forbearance Agreement, and discusses them in groups, including the conditions related to Vlahos, the conditions related to Pratt, and the conditions related to Masters. Opinion, ¶¶ 40, 44, 45. The Court employs a partial "domino effect" reasoning: after determining the Vlahos conditions were waived, the Court concludes the conditions requiring Masters to deposit $56,204 in unpaid interest and to grant Comerica an unlimited debit right in that account were consequently also waived "until Vlahos was able to sign."

---

[1] *See also* Comerica's default notice to Masters, issued November 25, 2008:

> Bank anticipates that discussions addressing the Liabilities may take place in the future. During the course of such discussions, Bank and Company may touch upon and possibly reach a preliminary understanding on one or more issues prior to concluding negotiations. *Notwithstanding this fact and absent an express written waiver by Bank, Bank will not be bound by an agreement on any individual issues unless and until an agreement is reached on all issues and such agreement is reduced to writing and signed by Company, Guarantors and Bank.*

(Emphasis added.)

Opinion, ¶ 46. I agree that a domino effect exists here, but the other way: because I believe the evidence does not support the conclusion that Comerica waived the Vlahos conditions, there is not a Vlahos waiver to carry over to Masters' conditions. While there are multiple evidentiary bases, in my view, to reject the conclusion that all of the unsatisfied conditions for the Forbearance Agreement were waived by Comerica, I believe the Vlahos conditions alone justify reversal of the District Court, and I turn to that basis.

¶92 The District Court credited the testimony of Masters CEO Howell, that when he told Comerica VP Norton that Vlahos was unavailable to sign the Forbearance Agreement until January 2, 2009, Norton had replied, "[t]hat's fine." Critically, the District Court concluded that this two-word statement "operates [as] Comerica['s] express statement of waiver of the *deadlines* for Vlahos' performance" (emphasis added) and also operates as an express waiver by Comerica of all "*conditions* relating to Vlahos," (emphasis added), which included the five conditions the District Court found were required of Vlahos: timely written acceptance of the Forbearance Agreement, timely hand delivery of the Forbearance Agreement, liquidation of non-cash assets into cash and transfer of such funds into a secured Comerica account, execution of a corresponding security agreement, and the timely deposit of additional cash in the necessary amount into Vlahos' Comerica Account. Notably, this was the only evidence of an express waiver by Comerica. The Court likewise cites this statement more than once to conclude the Vlahos conditions were waived. Opinion, ¶ 43.

¶93 The District Court clearly erred by concluding that this two-word statement constituted an express waiver of all the Vlahos conditions. Comerica offered a hearsay

51

objection to the question leading to this testimony because it was based upon a message Howell had received from Vlahos, who did not testify, and then conveyed to Norton. The District Court admitted Howell's testimony "for the purpose of the effect that it had upon the Defendant. Not for the truth of what Dr. Vlahos may have said." Assuming the proper crediting of the testimony on this basis, nonetheless the *substance* of the testimony went only to *one* Vlahos condition. The Howell testimony (omitting the exchanges about Comerica's hearsay objection) was as follows:

> COUNSEL: Did you ask [Vlahos] to sign the [Forbearance Agreement]?
>
> HOWELL: Yes.
>
> COUNSEL: After that phone call with Dr. Vlahos did you pass along the information to Mr. Norton?
>
> HOWELL: Yes.
>
> COUNSEL: And what, did you call Mr. Norton?
>
> HOWELL: Uh yes, it was on a phone call I think, yep.
>
> COUNSEL: Okay, and what did you tell Mr. Norton?
>
> .   .   .
>
> HOWELL: I told him that I'd finally been able to contact Dr. Vlahos and he would, he was unable to sign it until January 2nd when he returned.
>
> COUNSEL: And what was Mr. Norton's response?
>
> HOWELL: That's fine.

(Emphasis added.)

¶94 Consequently, Howell's testimony regarding Norton's "[t]hat's fine" comment on its face applied only to signing the Forbearance Agreement. However, the District Court found that the comment constituted an "express waiver" of all the Vlahos conditions, "[t]he Court concludes Comerica expressly waived the following [five] conditions relating to Vlahos due to Norton's express, assertive statement of '[t]hat's fine' to Howell." I would conclude this finding was clearly erroneous and the conclusion of law based thereon was incorrect. Even if the statement is credited for purposes of waiving the condition for signing the Forbearance Agreement, it does not encompass other conditions.

¶95 The District Court also found that Comerica had *impliedly* waived three Vlahos financial conditions by issuance of its entitlement order to Wachovia Securities on December 29, 2008, in preparation for foreclosure. The District Court found this was done "without prior notice to Vlahos," but no additional notice was required for this preliminary foreclosure step and, in any event, I disagree that Comerica's exercise of a contractual foreclosure remedy under the original loan documents is valid evidence of waiver of conditions for formation of the new Forbearance Agreement. These actions are antithetical. Thus, I would conclude that the District Court's conclusion that the Vlahos conditions were impliedly waived was incorrect as well. This necessarily undermines the domino conclusion that the condition requiring Masters to pay $56,204 in unpaid interest was also waived.

¶96 Consequently, I believe the evidence of record failed to satisfy the high standard necessary under Michigan law, that is, mutuality of intent based upon clear and convincing evidence to establish waiver only in "the most compelling circumstances." *Formall*, 360

N.W.2d at 906. While the discussion herein may be viewed as dwelling on technical aspects of the transaction, this was indeed a very technical transaction involving sophisticated parties. Comerica demanded multiple times, in writing, that "all issues" had to be resolved as written. Michigan law requires "the most compelling" proof that this requirement was waived.

¶97 Finally, there is another reason that Comerica should prevail in this matter, even assuming Comerica waived all the unsatisfied conditions and the Forbearance Agreement was validly formed. The new Agreement not only *preserved* Comerica's foreclosure remedies under the original loan documents, but also *created* additional remedies for Comerica. Under the Agreement, Comerica acquired the right to "terminate its forbearance prior to February 16, 2009 . . . in the event Bank, *for any reason, believes that the prospect of payment or performance is impaired*." (Emphasis added.) Thus, even under the new Forbearance Agreement as formed, Comerica was entitled to terminate its forbearance and proceed to foreclosure when it did and for the reasons it did.

¶98 I would reverse and enter judgment in favor of Comerica.

/S/ JIM RICE

Justice Laurie McKinnon joins in the dissenting Opinion of Justice Rice.

/S/ LAURIE McKINNON

54