NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0228n.06

Case No. 24-1790

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
May 05, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| COMERICA BANK, INC., a Texas banking association, successor in interest by merger to Comerica Bank, a Michigan banking corporation, | ) ) ) ) ) | |
| Plaintiff - Appellant, | ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| LARRY F. PRATT, individually and as trustee of the Larry F. Pratt Living Trust, under agreement dated 01/11/2002, as amended and restated under agreement dated 11/18/2003, as further amended and restated under agreement dated 04/13/2006, and as further amended 07/10/2006, | ) ) ) ) ) ) ) ) | OPINION |
| Defendant - Appellee. | ) ) | |

Before:  SUTTON, Chief Judge; MOORE and RITZ, Circuit Judges.

**RITZ, Circuit Judge.**  Comerica Bank seeks to enforce a guaranty agreement against Larry Pratt following a $10.5 million judgment against Comerica in Montana state court.  The district court ruled that the Montana judgment did not revive Pratt's guaranty agreement.  We affirm.

## BACKGROUND

### I.     Original loan and foreclosure

#### A.     Masters's loan agreement and Pratt's guaranty (2006-2008)[1]

Approximately 20 years ago, a group of investors formed Masters Group International, Inc. (Masters). *Masters Grp. Int'l, Inc. v. Comerica Bank* (*Masters I*), 352 P.3d 1101, 1104-05 (Mont. 2015). The idea behind Masters was to expand an existing office products business from the United Kingdom into the United States, with its headquarters in Butte, Montana. *Masters Grp. Int'l, Inc. v. Comerica Bank* (*Masters II*), 491 P.3d 675, 682 (Mont. 2021). Masters obtained financing from a variety of sources, including a $9 million loan from Comerica. Masters and Comerica executed the loan in July 2006, with amendments in 2007 and 2008 that brought the total loan balance to $10.5 million. *Id.* at 682-83.

Among the loan documents was an agreement with Larry Pratt, the defendant in this case, to guarantee the loan. The guaranty was secured by collateral held in Pratt's Comerica accounts. Pratt guaranteed the loan for $9 million, and others guaranteed the remaining loan balance. The final guaranty agreement contained the following reinstatement provision:

> 7. REINSTATEMENT: Notwithstanding any prior revocation, termination, surrender or discharge of this Guaranty (or of any lien, pledge or security interest securing this Guaranty) in whole or in part, *the effectiveness of this Guaranty . . . shall automatically continue or be reinstated in the event that any payment received* or credit given by the Bank in respect of the Indebtedness *is returned, disgorged or rescinded under any applicable state or federal law*, including, without limitation, laws pertaining to bankruptcy or insolvency, in which case this Guaranty, and all liens, pledges and security interests securing this Guaranty, shall be enforceable against the undersigned as if the returned, disgorged or rescinded payment or credit had not been received or given by the Bank, and whether or not the Bank relied upon this payment or credit or changed its position as a consequence of it.

---

[1] Many of these background facts were established as part of Montana state court proceedings. Though Comerica indicated that it does not agree with the outcome of the Montana litigation, it does not directly contest any facts established by the Montana courts.

RE 1-2, Pratt Guaranty, PageID 24-25 (emphasis added).

### B.    Masters's forbearance (2008)

In 2008, Masters defaulted, and Comerica refused to renew the loan. While Masters sought alternative financing, the original parties to the loan began negotiations for a forbearance agreement. By December 22, 2008, Pratt and Masters had signed the forbearance agreement, but, as Comerica knew and acknowledged, there were additional parties who could not be reached for signature until January 2, 2009. Before those final signatures were obtained, though, Masters and the guarantors began performing under the agreement. *Masters I*, 352 P.3d at 1120.

### C.    Comerica's breach (December 29-31, 2008)

In violation of the forbearance agreement, from December 29 through New Year's Eve, 2008, Comerica seized assets from Pratt's and Masters's Comerica accounts, as well as a variety of other sources, which by March totaled about $115,000 shy of $10.5 million dollars. The Montana courts found that this seizure precipitated the collapse of Masters's U.S. operations. *Masters II*, 491 P.3d at 684; *Masters I*, 352 P.3d at 1108. As a result of the seizure, for instance, Masters could not make payments to suppliers or write payroll checks. *Masters I*, 352 P.3d at 1108. The Montana trial court further found that Comerica benefitted from collecting the loan before 2009 by reaping interest payments and padding its 2008 balance sheets. In fact, the Comerica vice president who oversaw the agreement received a bonus.

### D.    Comerica's 2009 suit against Pratt

In March 2009, Comerica sued Pratt in the Western District of Michigan for breach of the guaranty agreement and sought to recover the remaining debt. In May 2009, Pratt paid the remaining balance of approximately $115,000. Comerica voluntarily dismissed its lawsuit and confirmed that Pratt's payment would satisfy his remaining obligations under the guaranty subject

to the reinstatement provisions. Comerica's business records then showed that the balance of the original Masters loan was $0.

## II.     Montana litigation (2011-2021)

### A.     Joint defense agreement and *Masters I* (2015)

In 2011, the Butte Local Development Corporation, from which Masters had also borrowed money, sued Masters in Montana state court, alleging that Masters had failed to meet its payment obligations. *Masters I*, 352 P.3d at 1108. That November, Pratt entered an agreement with Masters and the other guarantors to assign all claims against Comerica to Masters and work cooperatively with Masters in the litigation.

Masters then filed (in Montana state court) a third-party complaint against Comerica for its breach of the forbearance agreement. Comerica claims that this litigation was carefully designed to ensure that Comerica could not remove it to federal court as a third-party defendant. Indeed, Comerica tried twice to remove to federal court in Montana, but both attempts failed. *Butte Loc. Dev. Corp. v. Masters Grp. Int'l, Inc.*, No. CV 12-71-BU-DLC, 2012 WL 13019008 (D. Mont. Nov. 28, 2012); *Masters Grp. Int'l, Inc. v. Comerica Bank*, No. CV 15-44-BU-SHE (D. Mont. Oct. 23, 2015).

A jury awarded Masters over $52 million in punitive, compensatory, and consequential damages under Montana law. *Masters I*, 352 P.3d at 1109. However, in 2015, the Montana Supreme Court vacated the jury's decision and remanded for a new trial. *Id.* at 1124.

### B.     *Masters II* (2021)

Following a second trial (this time a bench trial), the Montana state court found that the forbearance agreement was enforceable and that Comerica had breached it. The trial court awarded damages of $10,595,514.16, plus interest and attorneys' fees. The court found that these

were the damages "naturally arising" from Comerica's breach of the forbearance agreement and reiterated that the breach "precipitated the collapse of the company." RE 12-2, Montana Trial Court Decision, PageID 107, 140.

The Montana Supreme Court affirmed (*Masters II*), except as to the award of attorneys' fees. 491 P.3d at 701. In particular, the court upheld the damages award, holding that "Masters is clearly entitled to the return of its wrongfully seized assets as damages from Comerica's breach of contract." *Id.* at 694. The court also upheld the lower court's requirement that Comerica should have affirmatively pleaded setoff or recoupment in order to apply the loan balance to the damages award. *Id.* Comerica paid a total of $20,951,362.34 as a result of the Montana judgment, which included the $10.5 million dollar damages award plus interest.

## III. Current litigation

After the Montana litigation, Comerica initiated this federal lawsuit against Pratt in October 2021, alleging that Pratt breached the guaranty agreement. Specifically, Comerica alleged that, as a result of the Montana judgment, it was required to "disgorge" the collateral it had seized, which triggered the reinstatement provision of the guaranty agreement. Comerica sought $9 million in principal as well as interest and attorneys' fees.

After discovery, the parties filed cross-motions for summary judgment. The district court granted summary judgment to Pratt, finding that the damages award constituted a conceptually different payment than disgorgement of the loan, and that therefore the reinstatement provision of the guaranty agreement had not been triggered. Comerica now appeals.

## ANALYSIS

### I.      Standard of review

We review a district court's grant of summary judgment de novo.  *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir. 2020).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We view the facts in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.     The reinstatement clause

The case hinges on whether the Montana damages award constituted disgorgement of the 2008-09 loan payments such that it reinstated Pratt's guaranty.  We agree with the district court that the damages award represented a separate sum from Masters's underlying debt, and thus did not invoke Pratt's reinstatement clause or revive Masters's indebtedness.

#### A.      Damages award

The guaranty agreement states that Pratt's obligation will be reinstated if "any payment received . . . is returned, disgorged, or rescinded under any applicable state or federal law."  RE 1-2, Pratt Guaranty, PageID 24-25.  We must determine whether the damages award is a "returned, disgorged, or rescinded [payment]."

The parties agree that Michigan law governs our interpretation of the guaranty agreement. Under Michigan law, "the primary goal in the construction or interpretation of any contract is to honor the intent of the parties."  *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994). When contract language is "clear and unambiguous, it is to be construed according to its plain sense and meaning."  *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d

106, 113 (Mich. 2005) (quoting *New Amsterdam Cas. Co. v. Sokolowski*, 132 N.W.2d 66, 68 (Mich. 1965)).

We hold that the plain meaning of a "returned, disgorged, or rescinded [payment]" unambiguously excludes the damages award here. It is true that the damages award required Comerica to "disgorge" a sum of money. "Disgorge" means "to give up . . . on request or under pressure." *Disgorge*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2019). The key question, then, is whether the Montana damages award required Comerica to give up *the payment* it received when it seized collateral in 2008-09. And to answer this question we determine what kind of damages the Montana courts awarded, and whether those damages are conceptually separate from the original payment.

The Montana trial court labeled the award as "seizure damages," a label that does not appear to be a term of art. *See Masters II*, 491 P.3d at 694 (writing that the term "does not appear to exist in Michigan law"). But the best understanding of this term is that it limited damages to those that stemmed directly from the seizure of collateral. *Cf.* RE 12-2, Montana Trial Court Decision, PageID 140 (considering the seizure damages "certain," while declining to award lost profits from Masters's collapse or other damages as speculative). The Montana Supreme Court confirmed that the only required damages were those that "[arose] naturally" from Comerica's breach of the forbearance agreement. *Masters II*, 491 P.3d at 694 (quoting *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980)).

The closest analogue for "seizure damages," then, is actual or compensatory damages. Damages are "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Damages*, *Black's Law Dictionary* (12th ed. 2024). "Actual damages" are "[a]n amount awarded to a complainant to compensate for a proven injury or loss" that "repay actual losses,"

while "compensatory damages" are "sufficient in amount to indemnify the injured person for the loss suffered." *Id.* These definitions provide a few common threads: compensation for a loss, and an amount calibrated to be equal to a realized loss.

The idea of "seizure damages" thus implies creation of a debt from Comerica to Masters, not the other way around. In breaching the forbearance agreement, Comerica racked up a $10.5 million injury to Masters for which Comerica had to compensate Masters. *See Masters II*, 491 P.3d at 694 (affirming "the [trial court's] ultimate determination" that "the Forbearance Agreement was a contract, breached by Comerica wrongfully initiating the offset of Masters's collateral, causing Masters to suffer damages in the amount of $10,595,514.16"). And the fact that the damages amount was calculated based on the loan did not make those damages the loan itself. To put it another way, Masters's injury was wholly separate from the original loan agreement. Indeed, Comerica admits that the original loan balance was reduced to zero in 2009.

Furthermore, as the Montana Supreme Court stated, the Montana judgment consisted of "damages arising naturally from Comerica's breach of the Forbearance Agreement," which are "the funds Comerica wrongfully seized." *Masters II*, 491 P.3d at 694. The Court continued: "Masters is clearly entitled to the return of its wrongfully seized assets *as damages* from Comerica's breach of contract." *Id.* (emphasis added). This language suggests that the wrongfully seized assets were converted to an award of damages.

To conflate the damages award with the original payment would undermine the Montana Supreme Court's decision that Comerica should compensate Masters (and the other parties to the forbearance agreement) for the injury it caused by breach. Comerica argues that Masters's creditors should be the ones to bear the risk of their bad investment. But, as the Montana Supreme Court found, Comerica's breach *precipitated* the collapse of Masters's U.S. operations. *Masters*

*II*, 491 P.3d at 694 (quoting *Masters I*, 352 P.3d at 1108) (emphasis added). We are required to respect the Montana courts' conclusion that Comerica's breach caused an injury in the amount of approximately $10.5 million, as well as the courts' chosen remedy for that breach. *See* 28 U.S.C. § 1738.

Comerica also points out that the damages calculation was the same "to the penny" as the original loan amount. The Montana courts, however, carefully calibrated the final damages award over a decade of litigation. Notably, in *Masters I*, the Montana Supreme Court overturned an initial damages award totaling over $52 million. 352 P.3d at 1109, 1124. That sum included principal and interest, lost profits, other consequential damages, and $10.5 million in punitive damages. *Id.* at 1109. When the trial court calculated the damages anew in *Masters II*, the result was much more generous to Comerica. The court limited damages to only those "naturally arising" from the breach, which the court in turn limited to the "certain" amount of seized funds. RE 12-2, Montana Trial Court Decision, PageID 140. Comerica's emphasis on the fact the damages award was calculated precisely to the amount of the loan obscures this history. The $10.5 million sum represented a carefully considered *reduction* in Comerica's overall liability. To characterize the award as a "refund" would ignore the years of litigation that led to the award.

In sum, the guaranty agreement does not encompass the damages award. Further, respect for the Montana Supreme Court's decision counsels against allowing the damages award to trigger the reinstatement clause.

### B.     Comerica's bankruptcy case law

Comerica responds by citing the Restatement of Suretyship and a line of bankruptcy cases to support its argument that its payment of the damages award triggered the reinstatement clause.

However, the enforcement of reinstatement provisions in those cases was unique to the bankruptcy context.

The Restatement on Suretyship states that "[w]hen a secondary obligation is discharged in whole or part by performance by the principal obligor . . . the secondary obligation revives to the extent that the obligee, under a legal duty to do so, later surrenders that performance or collateral, or the value thereof, as a preference or otherwise." Restatement (Third) of Suretyship & Guaranty § 70 (Am. Law Inst. 1996). This language is written broadly: if an obligee surrenders the value of collateral under a legal duty, then the guaranty is reinstated.

Of course, however, a guaranty is not revived when an obligee has a legal duty to surrender the value of collateral in an entirely unrelated proceeding. The narrower question, then, is what kind of legal proceeding, in fact, triggers reinstatement of a guaranty agreement. Though not expressly limited to the bankruptcy context, the restatement provision has "its most common application in the law of preferences." Restatement (Third) of Suretyship & Guaranty § 70 cmt. b.

In a preference action, a debtor repays funds to one creditor soon before declaring bankruptcy. *See* 11 U.S.C. § 547. When the debtor declares bankruptcy, the other creditors may sue for the return of that payment on the grounds that it is part of the estate and should have been distributed to creditors by the process outlined by bankruptcy law. In this way, the action favors fairness in the distribution of assets among creditors. When a payment is subject to a preference action, a guaranty is enforced "as though the payment had never been made." Restatement (Third) of Suretyship & Guaranty § 70 cmt. b.

Consider *Wallace Hardware Co. v. Abrams*, 223 F.3d 382 (6th Cir. 2000), a case on which Comerica places heavy reliance. There, a creditor seized collateral—warehouse inventory—from

a debtor who later went into bankruptcy. 223 F.3d at 388. As part of a preference action, the creditor entered into a settlement agreement with the bankruptcy estate to return the value of the seized inventory as a cash payment. *Id.* at 389. The credit was guaranteed, however, and we upheld the guarantor's payment obligation because the creditor was forced to disgorge the value of the inventory when settling a preference action. *Id.* at 408. A similar situation occurred in *In re SNTL Corp.*, where the court described this process as a creditor being "forced to refund a payment" to the obligor. 571 F.3d 826, 836 (9th Cir. 2009).

These cases, though, do not help Comerica, because preference actions are distinct from the circumstances presented by this case. First, the equitable and policy considerations underlying preference actions are long-established in statutes and case law. *See e.g.*, 11 U.S.C. § 547; *N. Bank of Ky. v. Farmers' Nat'l Bank*, 63 S.W. 604, 607 (Ky. Ct. App. 1901). The fear in not reviving guarantorship after a preference action is that creditors will refuse payments from debtors if they anticipate insolvency. Restatement (Third) of Suretyship & Guaranty § 70 cmt. b. The rule thus promotes efficiency and ease of lending.

The damages award, in contrast, is not a part of a broader statutory system that favors equitable distribution, like a preference action. To illustrate, the funds here were disgorged because the Montana courts determined the final allocation among parties to be the most equitable.

Second, preference actions are time-limited. Under the bankruptcy code, a preferential payment must occur within 90 days, or in some cases a year, of the debtor declaring bankruptcy. 11 U.S.C. § 547(b)(4). This meaningfully limits the reach of § 547. Here, however, Comerica set Pratt's indebtedness balance to zero over ten years before the damages award. While preference actions identify a discrete sum of money that was distributed outside the confines of pre-established bankruptcy proceedings, creditors may also be out of luck if payments occur far

enough in advance. The time-limited nature of preference actions reveals the far-reaching consequences of Comerica's proposed rule: there is no circumstance under which it would lose the value of the loan as a result of causing harm.

For these reasons, Comerica's attempt to liken this case to preference actions is unavailing.

## CONCLUSION

We hold that Masters's damages award is wholly separate from the indebtedness underlying Pratt's guaranty agreement. Because the guaranty agreement does not apply, we need not consider Comerica's arguments regarding interest and attorneys' fees calculations, or Pratt's remaining affirmative defenses.

We affirm.